UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>   v.<br><br>SHOHJAHONMIRZO ABDULMALIKOV,<br><br>                Defendant. | CASE NO. 3:24-cv-05786-DGE<br><br>ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 2) |

      The United States Department of Homeland Security, Immigration and Customs Enforcement (hereinafter "ICE"), by and through the United States Attorney for the Western District of Washington, has filed an ex parte emergency motion for a temporary restraining order ("TRO") permitting the Government to immediately perform involuntary medical monitoring, testing, and physical examinations, as well as the administration of involuntary hydration intravenously and nutrition via nasogastric tube, for Shohjahonmirzo Abdumalikov, who is currently being held as a civil detainee at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington.

1   Abdumalikov is a citizen and national of Uzbekistan. (Dkt. No. 5 at 3.) Abdumalikov has been in ICE custody since September 3, 2023. (*Id*.) He was transferred to the NWIPC on August 8, 2024 and remains there. (*Id*.) Abdumalikov was ordered removed to Uzbekistan on June 28, 2024. (*Id*.) He has appealed that decision and the appeal remains pending. (*Id*.)

   On July 25, 2024, Abdumalikov missed his ninth consecutive meal and was officially listed by ICE as being on a hunger strike. (*Id*.) As of breakfast on September 19, 2024, he has missed 179 meals and has consumed minimal food. (Dkt. No. 6 at 4.) Abdumalikov weighed 143 pounds at the beginning of his hunger strike. (*Id*. at 6.) As of September 2, 2024, he weighed 122 pounds and had dropped 14.7% of his body weight. (*Id*.) Since September 3, 2024, Abdumalikov has declined any medical assessment, has taken minimal nutrients and has had decreasing fluid intake. (*Id*.) ICE medical staff has counseled Abdumalikov on the effects of his hunger strike on his body. (*Id*. at 4.) Staff also has informed him of ICE's intent to pursue involuntary hydration and feeding to prevent injury and/or death if he continues his hunger strike. (*Id*.)

   ICE's medical expert opines Abdumalikov's body will begin to suffer significant damage noting that it is difficult to predict how long Abdumalikov can survive without appropriate sustenance. (*Id*. at 6.) The expert opines Abdumalikov's health will continue to decline, noting that, "[m]edical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of a patient's initial weight." (*Id*.) The expert opines Abdumalikov "will reach the point where he will require immediate medical intervention to prevent further deterioration and serious medical complications" if he continues with his hunger strike. (*Id*. at 7.) The expert further opines, "The issuance of a court order to perform involuntary blood draws, collecting urine samples, all

1  necessary physical examinations, initiation of IV hydration, and involuntary [nasogastric]
2  feeding is medically necessary to preserve and sustain Abdumalikov's health, welfare, medical
3  safety, and life." (*Id*. at 8.)
4        The Government requests immediate authority to evaluate and care for Abdumalikov's
5  health as requested by ICE's medical expert.  It appears the Government has caused to be served
6  the motion for temporary restraining order and supporting documents (presumably with the
7  summons and complaint) on Abdumalikov. (Dkt. No. 7 at 14.)
8        A plaintiff seeking a temporary restraining order must show: (1) they are likely to
9  succeed on the merits, (2) the potential for irreparable harm in the absence of preliminary relief,
10 (3) the balance of equities is in favor of injunction, and (4) the relief sought is in the public
11 interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, a plaintiff
12 may obtain relief if they (1) demonstrate a serious question going to the merits has been raised;
13 (2) the balance of hardships tips sharply in plaintiff's favor; (3) irreparable harms is likely to
14 occur; and (4) relief is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d
15 1127, 1134–1135 (9th Cir. 2021).
16       Temporary restraining orders "should be restricted to serving their underlying purpose of
17 preserving the status quo and preventing irreparable harm just so long as is necessary to hold a
18 hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. Of Teamsters and Auto Truck*
19 *Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974).  TROs can be mandatory in that
20 they can order a party to perform an affirmative act or a specific course of conduct. *State of*
21 *Alabama v. United States*, 304 F.2d 583, 590 (5th Cir. 1962), *aff'd sub nom. Alabama v. United*
22 *States*, 371 U.S. 37 (1962) ("Mandatory injunctions affirmatively compelling the doing of some
23 act, rather than merely negatively forbidding continuation of a course of conduct, are a
24

traditional tool of equity."). Irreparable harm, as TROs seek to prevent, are injuries "for which there is no adequate legal remedy." *See Nat'l Ass'n of Manufacturers v. United States Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 569 (N.D. Cal. 2020) (citing *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1279 (9th Cir. 2020)).

At present, the Court does not have the benefit of any legal argument from Abdumalikov identifying his position on whether the Government's request for a temporary restraining order is authorized. Assuming Abdumalikov opposes the Government's motion, the Court acknowledges there may exist differences of opinion as to what standard should be applied when evaluating the constitutionality of administering involuntary medical care, hydration, and nutrition to civil immigration detainees. *See In re Bahadur*, 441 F.Supp.3d 467, 475 (W.D. Tex. 2020) (discussing possible standards under *Turner v. Safley*, 482 U.S. 78 (1987), *Youngberg v. Romeo*, 457 U.S. 307 (1982), and *Bell v. Wolfish*, 441 U.S. 520 (1979)).

Notwithstanding, 8 U.S.C. § 1231(f) authorizes the Attorney General, through ICE, to provide necessary medical treatment to non-citizens in removal proceedings. *See* 8 U.S.C. § 1231(f). And, at least one district court has found *Youngberg*'s standard is the correct one to apply in matters involving immigration detainees. *See In re Kumar*, 402 F. Supp. 3d 377, 383 (W.D. Tex. 2019). *Kumar* concluded the state's interest in preventing the death of an immigration detainee outweighed the detainee's liberty interest in conveying a message through a hunger strike or in directing their own medical care. 402 F. Supp. 3d at 384–385 (while in immigration custody, "his [liberty] interest is diminished as his chosen avenue of conveying his message, suicide by starvation, is not a liberty interest protected under the Constitution"). *Kumar* granted the request to involuntary provide medical care and feeding to the detainee. *Id*. at 387.

Based on the motion and supporting declarations, the Court finds the Government has met its burden for the issuance of a temporary restraining order. There is a serious question going to the merits of the Government's obligations and its authority to monitor and maintain the health of an immigration detainee. Also, assuming the application of *Youngberg*, the Government is likely to succeed on the merits. Because of the serious nature of the harm that could result to Abdumalikov, the balance of hardships tips sharply in the Government's failure and irreparable harm could result if a temporary restraining order is not issued. There also is public interest in ensuring that Governmental institutions comply with their duties to protect the health and welfare of those individuals in detention.

The Court also finds the Government's interest in maintaining Abdumalikov's health and welfare and the immediate threat of injury requires this order be issued before full notice and opportunity for Abdumalikov to be heard.

Therefore, IT IS HEREBY ORDERED that ICE may undertake necessary medical treatment and testing to save Abdumalikov's life and prevent injury, including:

1. Physical examinations, including daily weight assessments and frequent vital sign checks;
2. Laboratory tests, consisting of:
    a. Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests include: BUN (blood urea nitrogen), creatinine level, and proteins. It also reveals electrolyte disturbances as potassium, phosphate, magnesium and glucose levels.
    b. Complete blood count. This test reveals the hemoglobin level.

      c. Urinalysis, which reveals the presence of ketones, blood and crystals in the urine.

      d. Thiamine levels to assess deficiency after day 14 of a hunger strike.

      e. Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

      f. Creatine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to the breakdown of muscle tissue that can fatally damage other vital organs.

      g. Pre-albumin levels. Pre-albumin is used as a marker for nutritional status evaluation, and levels will decrease over time the longer a patient fails to consume adequate nutrition. The pre-albumin level correlates with patient morbidity and mortality risk. Normal pre-albumin is 15-35 mg/dL. When pre-albumin falls to 5-11 mg/DL, significant morbidity risks exist and aggressive nutritional support is necessary;

3. The administration of involuntary intravenous hydration; and

4. The administration of involuntary nutrition via a nasogastric tube and/or intravenously.

    IT IS HEREBY FURTHER ORDERED that if Abdumalikov refuses to cooperate with the necessary medical treatment and monitoring, ICE and medical staff as the Northwest ICE Processing Center may use soft medical restraints to assure the safety of Abdumalikov and the medical staff when administering the necessary treatment.

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 2) - 6

This temporary order expires on October 4, 2024 unless it is extended by further order of this Court.  *See* Fed. R. Civ. P. 65(b)(2).  The Court will set a preliminary injunction hearing for October 2, 2024 at 11:00 AM.  *See* Fed. R. Civ. P. 65(b)(3).  The Government must be prepared to present evidence in support of its request for an injunction lasting for the duration of Abdumalikov's hunger strike and a representative of ICE must be present for the hearing.  The Government must also file a status report, supported by affidavit, on Abdumalikov's condition and any supplemental briefing on its request for a longer injunction no later than October 1, 2024 at 5:00 P.M.  The United States must also arrange for Abdumalikov to appear by telephone or videoconference for the hearing (and must immediately inform the Court of whether an interpreter is needed and the specific language required).  ICE is directed to provide a copy of this order and the notice of hearing to Abdumalikov as soon as possible.

Dated this 20th day of September, 2024.

David G. Estudillo
United States District Judge